IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TAILER RAMIREZ; and
MANUEL RAMIREZ,

     Plaintiffs,

v.

LTD FINANCIAL SERVICES, L.P.,

     Defendant.

CIVIL ACTION NO.
1:19-cv-02575-CAP-RDC

## FINAL REPORT AND RECOMMENDATION

Plaintiffs Tailer Ramirez and Manuel Ramirez, wife and husband, filed this consumer-credit action against Defendant LTD Financial Services, L.P. ("LTD"), alleging violations of several federal and state laws stemming from LTD's debt-collection efforts, including the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, the federal Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, and Georgia's Fair Business Practices Act ("FBPA"), O.C.G.A. §§ 10-1-390 *et seq*. LTD has moved for summary judgment as to all claims, (Doc. 51). For the reasons below, the undersigned **RECOMMENDS** that LTD's Motion for Summary Judgment be **GRANTED**.

# I. BACKGROUND

## A. Factual Background

This case concerns the legality of certain actions taken by LTD with respect to past-due student loans owed by Plaintiff Tailer Ramirez—specifically, (1) an unauthorized $79.00 electronic payment withdrawal from Plaintiff Manuel Ramirez's personal checking account, and (2) a single phone call to Ms. Ramirez after she hired an attorney.[1] The underlying facts are largely undisputed.

### i. LTD's Actions

Due in part to some unfortunate personal-health challenges, Tailer Ramirez fell behind on student loans she borrowed using her maiden name, "Tailer Stofer," with an ex-boyfriend, Jacob Lorenz, serving as co-obligor. (Doc. 51-2 ["Def. SMF"] ¶¶ 1, 3; Doc. 56-3 ["Pl. Resp."] ¶ 1; Doc. 56-4 ["Pl. SMF"] ¶¶ 1–5). On April 10, 2018, her creditor placed two separate student loan accounts with LTD, a debt collection agency, using these names. (Doc. 51-2 ["Def. SMF"] ¶¶ 1, 3; Doc. 56-3 ["Pl. Resp."] ¶ 1). The accounts (collectively, the "Loan Accounts") were grouped together in LTD's electronic record-keeping system, with the first assigned an account number ending in "0131" (the "0131 Account"), and the second an account number ending in "0132" (the "0132 Account."). (Def. SMF ¶ 2; Pl. Resp. ¶ 1).

---

[1] In their Complaint, Plaintiffs also assert claims based on LTD's alleged unlawful contact with a third-party, (Doc. 1 ¶¶ 21–22, 32, 41), but in response to the pending motion they have expressly withdrawn all such claims, (Doc. 56-5 at 5).

Between the two Loan Accounts, LTD designated the 0131 Account as the "primary" account. (*Id.*). Ms. Ramirez's address was recorded in LTD's system as "907 Cannon View Ln, Junction City, KS 66441," which is where the couple lived in early 2018. (Def. SMF ¶ 6; Pl. Resp. ¶ 1; Doc. 51-3, Exh. A).

At some point thereafter, Mr. Ramirez authorized LTD to withdraw funds from his personal checking account to make recurring payments toward the Loan Accounts on his wife's behalf. (Def. SMF ¶¶ 18–19; Pl. Resp. ¶ 5). The checking account was not a joint account to which Ms. Ramirez had access. (*Id.*). In August 2018, Ms. Ramirez contacted LTD to stop her husband's electronic payments; however, LTD did not cancel the payments at Ms. Ramirez's request because they were withdrawn from Mr. Ramirez's personal checking account.[2] (Pl. SMF ¶ 9; Doc. 56-1 at 2–3).

Later, on September 28, 2018, Mr. Ramirez himself called LTD to revoke his authorization for future electronic payments. (Def. SMF ¶ 20; Pl. Resp. ¶ 5). During the call, Mr. Ramirez explained that he was calling "about [his] wife's account. Her name is Tailer Stofer." (Doc. 56-1 at 1). Before processing the request, the LTD representative with whom Mr. Ramirez spoke confirmed that "[t]his [call] is

---

[2] Plaintiffs do not allege in their Complaint that Ms. Ramirez attempted to cancel her husband's electronic payments, and their corresponding legal claims do not turn on any such attempt. *See* (Doc. 1 ¶¶ 19–27, 35, 43, 49–51). Nor have Plaintiffs presented any evidence that Ms. Ramirez was in fact authorized to make or cancel withdrawals from Mr. Ramirez's personal checking account.

3

regarding Tailer's . . . Student Loan ending in 0131. . . [s]he did . . . give us permission to speak with you." (*Id.* at 2). The LTD representative then placed a notation on the 0131 Account recording Mr. Ramirez's revocation and cancelled any further electronic payments. (Def. SMF ¶ 21; Pl. Resp. ¶ 5). The representative separately placed a notation on the 0132 Account but did not actually cancel electronic payments as to that account. (Def. SMF ¶ 22; Pl. Resp. ¶ 5).

Because payments on the 0132 Account had not been cancelled, in November 2018, LTD withdrew $79.00 from Mr. Ramirez's checking account. (Pl. SMF ¶ 14). Evidently, LTD withdrew no further payments from Mr. Ramirez's checking account thereafter. *See* (Doc. 1; Pl. SMF). After the November 2018 payment withdrawal, Plaintiffs engaged legal counsel.

On December 5, 2018 at 11:48 p.m., attorney Clifford Carlson electronically delivered a letter to LTD's general customer-care email address on Plaintiffs' behalf. (Def. SMF ¶ 25; Pl. Resp. ¶ 8). The letter stated, in relevant part:

> I, along with Ronald Daniels of Daniels Law LLC and Trey Taylor of Taylor Law, LLC, represent Tailer and Manny Ramirez in connection with the alleged debt associated with the SSN ending in [----] and any other account or alleged account you or your clients allege Mrs. and/or Mr. Ramirez is responsible for. You are not to contact my clients for any purpose. If you wish to discuss an alleged debt, you must do so through me until further advised. Pursuant to 15 U.S.C. § 1692c(C), if you are a "debt collector," you are directed to cease and desist any further communication with my client and collection efforts immediately. Moreover, we demand any automatic payment drafting for any and all accounts cease immediately.

4

(Def. SMF ¶¶ 25–27; Pl. Resp. ¶ 8; Doc. 51-10 at 2). Less than fourteen hours later, at 1:05 p.m. on December 6, 2018, LTD's customer-care unit responded to Mr. Carlson via email, explaining that LTD needed additional information to locate the account at issue. (Def. SMF ¶ 28; Pl. Resp. ¶ 8). The email stated:

> We are unable to locate the account based upon the information you provided. In order for us to locate the account, we need one of the following:
>
> -Account/Reference number
> -Full Address
> -Social Security number(s)
> -Phone number(s)

(*Id.*; Doc. 51-10 at 3). LTD is only able to name-search its records by using the name of the consumer under whom an account is listed, and the company is unable to search its account records solely on the basis of partial consumer social-security numbers. (Def. SMF ¶ 49; Pl. Resp. ¶ 11; Doc. 61-1 ¶¶ 7–8).

Mr. Carlson followed up with an email to LTD days later, on December 9, 2018 at 4:10 p.m., stating: "[Plaintiffs'] address is 5513 Boby Drive; Columbus, GA 31907." (Def. SMF ¶ 29; Pl. Resp. ¶ 8; Doc. 51-10 at 4). Plaintiffs had relocated to this address in August 2018, (Doc. 51-4 at 48), and Ms. Ramirez testified that she believes she "would have" informed LTD by phone, (*id.* at 31–33). However, Plaintiffs admit that there is no evidence showing that they ever actually forwarded this address to LTD, or that LTD's records were otherwise updated at the time. (Def. SMF ¶¶ 13, 16; Pl. Resp. ¶¶ 4–5; Doc. 51-4 at 34). The next day, on December 10,

5

2018, LTD again responded that it needed additional information, explaining:

> We are still unable to locate the account based upon the information you provided. In order for us to locate the account, we need one of the following:
>
> -Account/Reference number
> -Social Security number(s)
> -Phone number(s)

(Def. SMF ¶ 30; Pl. Resp. ¶ 8; Doc. 51-10 at 4). Mr. Carlson did not respond. (Def. SMF ¶ 31; Pl. Resp. ¶ 8).

On December 11, 2018, six days after Mr. Carlson's letter to LTD, an LTD representative called Ms. Ramirez regarding the Loan Accounts. (Pl. SMF ¶ 16; Doc. 62 ["Def. Resp."] ¶ 16). At the start of the call, the LTD representative stated that she was "[t]rying to get ahold of Tailer Stofer," and requested confirmation that she was in fact "speaking with Tailer Stofer." (Doc. 56-2 at 1). Ms. Ramirez confirmed—although she did not provide her married name—and then she immediately informed the representative that she was "working with attorneys." (*Id.*). The representative then asked for the attorney's name and number. (*Id.*). Ms. Ramirez provided Mr. Carlson's name and phone number, and the LTD representative confirmed that the legal representation related to the Loan Accounts. (Pl. SMF ¶ 17; Def. Resp. ¶ 17; Doc. 56-2 at 1–2). The parties did not further discuss collection on the Loan Accounts, and the call ended approximately one minute later with the LTD representative indicating that she would give Plaintiffs' attorney a call.

6

(Doc. 56-2 at 2–3). LTD made no further calls to Plaintiffs. *See* (Doc. 1; Pl. SMF).

### *ii. LTD's Policies & Procedures*

LTD has established a general Compliance Program Policy, the purpose of which is to ensure company compliance with "all applicable consumer protection statutes and regulations." (Def. SMF ¶ 35; Pl. Resp. ¶ 9; Doc. 51-3 at 30). To that end, the company set up a Steering Committee, which meets monthly, "to oversee, review and supervise" compliance activities, and it has appointed a Chief Compliance Officer "to manage the consumer compliance risk for the company." (Doc. 51-3 at 30–31). The Chief Compliance Officer is responsible for developing training material to ensure legal compliance across the company, and the Steering Committee ensures that such training is effectively implemented. (*Id.* at 33).

As particularly relevant here, LTD has policies specifically addressing EFTA and FDCPA compliance. (Def. SMF ¶ 35; Pl. Resp. ¶ 9; Doc. 51-3 at 35–45). The EFTA policy sets out guidelines regarding the authorization and processing of electronic payments, including the steps that must be taken to authorize and alter such payments. (Doc. 51-3 at 39–40). Among other things, the policy provides that the party authorizing payment has "the ability to change, cancel or revoke the authorization by contacting and speaking with a representative of LTD." (*Id.* at 40). In such event, the policy provides detailed step-by-step procedures requiring employees to notate the appropriate account and notify the bookkeeping department

regarding the request. (*Id.* at 43–45). The policy also requires that electronic payments "only be taken from the owner of the [relevant] bank account or an authorized signor on the bank account." (*Id.* at 41). When multiple related accounts are grouped together, certain notations made on the designated primary account will automatically be reflected as notations on related accounts. (Def. SMF ¶ 40; Pl. Resp. ¶ 9). However, certain other notations—for example, placing a telephone number on a do-not-call list, or changing or cancelling an electronic payment authorization—will not automatically be notated on the other grouped accounts. (Def. SMF ¶¶ 41, 42; Pl. Resp. ¶ 9). Employees are instructed that, in these cases, separate actions and notations must be manually entered for each of the related accounts. (Def. SMF ¶ 43; Pl. Resp. ¶ 9).

LTD's FDCPA policy establishes guidelines on consumer communications and sets compliance expectations for all employees, providing for continuous employee monitoring and bi-annual testing. (Doc. 51-3 at 35–37). In particular, the policy expressly provides that "[i]f an account representative knows that the consumer has retained an attorney to handle the debt and can easily ascertain the attorney's contact information, all contacts must be with that attorney, unless the attorney is unresponsive (after a minimum of 30 days) or agrees to allow direct communication with the consumer." (*Id.* at 35). A related policy formally establishes the computerized account scripts and procedures that employees are required to

8

adopt when a consumer advises of legal representation. (*Id.* at 46). For instance, employees are required to obtain the full name and phone number of the consumer's attorney, and then activate certain computer fields while inputting the attorney information into the consumer's electronic account. (*Id.* at 46–47).

LTD trains its employees on the above policies and procedures, violation of which "may result in disciplinary action, up to and including termination" and potential legal liability for damages. (*Id.* at 37–39, 42–43, 46; Def. SMF ¶¶ 44, 46; Pl. Resp. ¶¶ 9–10).

### B. Procedural History

On June 4, 2019, Plaintiffs initiated this action. They allege that LTD's actions violated the FDCPA, EFTA, FBPA, and Georgia's Unfair and Deceptive Practices Toward the Elderly Act ("UDPTEA"), O.C.G.A. §§ 10-1-850 *et seq.* (Doc. 1).

LTD has moved for summary judgment as to all claims, submitting a Statement of Material Facts and various evidentiary materials in support. (Doc. 51). Plaintiffs oppose the motion, (Doc. 56), which is now ripe for review.

## II. LEGAL STANDARD

A reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the initial burden to show the district court, by reference to

materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If, in response, the non-moving party does not sufficiently support an essential element of her case as to which she bears the burden of proof, summary judgment is appropriate. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000).

Genuine issues in dispute are those for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "In determining whether genuine issues of material fact exist, [the reviewing

court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." *Rice-Lamar*, 232 F.3d at 840 (citing *Anderson*, 477 U.S. at 255). However, when the record "taken as a whole" could not support a reasonable finding for the non-movant, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Plaintiffs have asserted four counts in their Complaint, under the FDCPA (Count I), FBPA (Count II), UDPTEA (Count III), and EFTA (Count IV), respectively. (Doc. 1). Several of those counts include multiple separate claims. The present dispute, however, is concentrated at just two points: (1) first, on LTD's conduct after Mr. Ramirez withdrew his authorization for electronic payments on the Loan Accounts; and (2) second, on LTD's conduct after Plaintiffs engaged legal counsel. Because the operative events giving rise to Plaintiffs' claims are both fewer and more clearly distinct than the several claims themselves, the following discussion is tailored accordingly.

### A. LTD's Unauthorized Withdrawal of Payment from Mr. Ramirez

Plaintiffs claim that LTD violated federal and state law when it electronically withdrew a $79.00 payment from Mr. Ramirez's checking account in November

11

2018 after he called to cancel such payments.[3] (Doc. 1 ¶¶ 35, 43, 49–51; Doc. 56 at 10–14). In its motion, LTD does not dispute the unauthorized withdrawal in the first instance, but nevertheless argues that no liability can attach because the withdrawal was a "bona fide error." (Doc. 51-1 at 13–21; Doc. 61 at 7–14).

### i. Governing Statutes

Plaintiffs contend that LTD's unauthorized withdrawal was unlawful in three ways—that is, under the FDCPA, FBPA, and EFTA.

Let's begin with the FDCPA. The FDCPA is a federal statute that "regulates what debt collectors can do in collecting debts." *Miljkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291, 1297 (11th Cir. 2015). Specifically, it aims to remedy abusive and deceptive debt collection practices by outlawing the use of "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f; *see also* 15 U.S.C. § 1692e; *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). To prevail on an FDCPA claim, a plaintiff must establish that: (1) she was the object of collection activity arising from consumer debt; (2) the defendant qualifies as a "debt collector" under the FDCPA; and (3) the defendant engaged in an act or omission prohibited by the FDCPA. *See Moore v. McCalla Raymer, LLC*, 916 F. Supp. 2d 1332, 1347 (N.D. Ga. 2013) (quotation and citation omitted). Only

---

[3] Although not made plain in their Complaint, Plaintiffs have clarified in briefing that this set of claims is asserted solely on behalf of Mr. Ramirez. (Doc. 56 at 9, 17).

the third element is presently at issue. As relevant here, Section 1692f(1) of the FDCPA prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

For its part, Georgia's FBPA similarly prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." O.C.G.A. § 10-1-393(a). And Georgia courts have held that a violation of federal law under the FDCPA constitutes a violation of state law under the FBPA. *See 1st Nationwide Collection Agency, Inc. v. Werner*, 654 S.E.2d 428, 431 (Ga. Ct. App. 2007); *accord Harris v. Liberty Cmty. Mgmt., Inc.*, 702 F.3d 1298, 1303 (11th Cir. 2012). Plaintiffs rely on this derivative feature of the FBPA, as they allege no standalone violation of the FBPA as such, but instead assert only a predicate violation of the FDCPA—namely, LTD's unauthorized withdrawal from Mr. Ramirez.

Lastly, the federal EFTA governs electronic fund transfers that "authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). This statute provides, in pertinent part:

> A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made. A consumer may stop payment of a preauthorized electronic fund transfer

by notifying the financial institution orally or in writing at any time up
to three business days preceding the scheduled date of such transfer.

15 U.S.C. § 1693e(a).

There is no dispute here that Mr. Ramirez initially granted but later revoked his authorization for electronic payments on the Loan Accounts from his personal checking account, and that after such revocation, LTD nevertheless withdrew a single $79.00 payment. LTD concedes as much, but insists that it is entitled to summary judgment in any case based on an affirmative defense—namely, the bona fide error defense.

### ii. Bona Fide Error Defense

Each of the statutes at issue—*i.e.*, the FDCPA, FPBA, and EFTA—expressly provides for an affirmative "bona fide error" defense, and each does so in closely cognate language. Emblematic is Section 1692k(c) of the FDCPA, which states:

A debt collector may not be held liable in any action brought under this
subchapter if the debt collector shows by a preponderance of evidence
that the violation was not intentional and resulted from a bona fide error
notwithstanding the maintenance of procedures reasonably adapted to
avoid any such error.

15 U.S.C. § 1692k(c). The EFTA's bona fide error provision[4] mirrors the FDCPA's

---

[4] Section 1693m(c) of the EFTA provides: "[A] person may not be held liable in any action brought under this section for a violation of this subchapter if the person shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1693m(c).

own, and has been interpreted by federal courts in precisely the same way. *See, e.g.,* *Singer v. EIntelligence, Inc.*, 55 F. Supp. 3d 1043, 1051–53 (N.D. Ill. 2014); *In re Cardtronics ATM Fee Notice Litig.*, 874 F. Supp. 2d 916, 922–23 (S.D. Cal. 2012); *Simone v. M&M Fitness LLC*, No. CV-16-01229-PHX-JJT, 2017 WL 1318012, at *4–5 (D. Ariz. Apr. 10, 2017). The undersigned will follow suit in this case. Meanwhile, the FBPA's bona fide error provision[5] is not quite identical to the FDCPA, but is nevertheless linguistically and substantively a very close cousin. In the absence of any caselaw interpreting the FBPA at odds with the FDCPA (there appears to be none), or argument from Plaintiffs to the contrary (there is none), the undersigned likewise construes the FBPA's bona fide error provision, to the extent necessary for present purposes anyway, consistent with its FDCPA counterpart. This makes further sense here given that Plaintiffs' FBPA claim ultimately hinges on an underlying FDCPA violation in the first instance, with such predicate violation obviously subject to the FDCPA's bona fide error defense.

The bona fide error defense insulates debt collectors from liability even when they have failed to comply with certain other governing requirements. *See Owen,* 629 F.3d at 1270–71; *Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350,

---

[5] Section 10-1-400 of the FBPA provides: "[R]ecovery will be limited to the amount, if any, by which the injured party suffered injury or damage caused by the violation if the adverse party proves that the violation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid any such error and that such error was not the result of negligence in the maintenance of such procedures." O.C.G.A. § 10-1-400.

1352–53 (11th Cir. 2009). A debt collector asserting the bona fide error defense must show by a preponderance of the evidence that its violation: (1) was not intentional; (2) was a bona fide error; and (3) occurred despite the maintenance of procedures reasonably adapted to avoid any such error. *Owen,* 629 F.3d at 1271. Regarding the first element, an unintentional act is one that lacks "specific intent" to violate the law. *Arnold v. Bayview Loan Servicing, LLC*, 659 F. App'x 568, 570 (11th Cir. 2016). In other words, a debt collector must show "that the violation was unintentional, not that the underlying act itself was unintentional." *Id.* (quotation and citation omitted). A bona fide error, in turn, is one "made in good faith; a genuine mistake, as opposed to a contrived mistake." *Edwards*, 584 F.3d at 1353 (quotation and citation omitted).

Here, LTD has presented uncontroverted evidence showing that its unauthorized withdrawal of $79.00 from Mr. Ramirez's checking account as payment on the 0132 Account in November 2018 was an unintentional mistake. Notably, when Mr. Ramirez phoned LTD to cancel payments, the only account specifically referenced on the call was the 0131 Account. And the LTD representative with whom Mr. Ramirez spoke did indeed cancel all future payments on that account. In accordance with LTD policy, the representative also entered a contemporaneous notation on the secondary 0132 Account, but the representative failed to cancel the corresponding payments. Thereafter, just a single $79.00

16

payment was withdrawn. Even construing these facts in Plaintiffs' favor, there is no hint in the record that the LTD representative intentionally refused to cancel payments on the 0132 Account notwithstanding Mr. Ramirez's request and LTD's own internal policies to the contrary, or otherwise acted in bad faith.[6]

The key issue, then, concerns the third element of the defense—that is, whether LTD maintained adequate procedures so as to reasonably avoid the type of error at issue. This inquiry is approached in two steps. The first step is to see "whether the debt collector 'maintained'—*i.e.*, actually employed or implemented— procedures to avoid errors." *Owen*, 629 F.3d at 1274 (citation omitted). The second step is to determine, more narrowly, "whether the procedures were 'reasonably adapted' to avoid the specific error at issue." *Id.* (citation omitted). The inquiry is unavoidably "fact-intensive." *Id.*

While bearing in mind that the analysis must proceed "on a case-by-case

---

[6] Plaintiffs argue that LTD's policies and procedures cannot satisfy the elements of the bona fide error defense because the company separately incentivizes employees with bonuses if they meet collection goals, an incentive which Plaintiffs label "inherently unreasonable." (Doc. 56 at 12–14). People are imperfect, to be sure—as noted, the bona fide error defense assumes as much. The trouble with Plaintiffs' argument is that it assumes *too* much. Incentivizing collection activity may indeed create a moral hazard of sorts, as Plaintiffs suggest, but that abstract hazard is present in some sense for every member of the debt collection industry. In other words, without the collection of debts, there is no industry, there are no agencies, and there are no employees. It behooves every such member, then, to maximize collection. That is, after all, why we have protective countermeasures like the FDCPA in the first place—and for good reason. But accepting that truism, there is no indication in the record that the marginal benefits presented by circumstances like those present here—that is, the partial cancellation of payment on grouped accounts—was or would be sufficient to systematically incentivize employees to violate multiple express company policies on pain of possible termination or personal liability.

17

basis," *id.*, as a practical matter, there are some guiding principles available to assist. To start, recognizing that "debt collectors operate under time and resource constraints," *id.* at 1276, the bona fide error defense does not set an impossibly high hurdle. Errors happen—that is an unfortunate fact of life, and the bona fide error defense presupposes as much. Accordingly, Section 1692k(c) "does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution," *Bacelli v. MFP, Inc.*, 729 F. Supp. 2d 1328, 1333 (M.D. Fla. 2010) (quotation and citation omitted). In short, the relevant procedures "need not be foolproof." *Rhinehart v. CBE Grp., Inc.*, 714 F. Supp. 2d 1183, 1185 (M.D. Fla. 2010). Having said that, to successfully invoke the defense, a debt collector must present evidence identifying and explaining the actual procedures maintained to guard against the specific error at issue, as conclusory declarations alone will not do. *See Bacelli*, 729 F. Supp. 2d at 1333. Moreover, the defense only applies to certain kinds of errors—namely, clerical errors and mistakes of fact, not mistakes in legal judgment. *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 604–05 (2010).

Synthesizing these principles with relevant caselaw suggests the following. In order to avail itself of the bona fide error defense, a debt collector must present evidence of the actual procedures it maintains, which procedures will consist—in the prototypical case—of routine and largely mechanical processes designed to

guard against the type of clerical error or mistake of fact at issue, as evidenced by, for example, targeted internal (as opposed to outsourced) policies and controls together with corresponding employee training programs. *See, e.g., Owen*, 629 F.3d at 1275–77 (suggesting that reasonable procedures should prevent errors rather than correcting them after the fact, and should include "internal controls" and "training techniques" to ensure statutory compliance); *Arnold*, 659 F. App'x at 570–71 (11th Cir. 2016) (finding that "written policies," "ongoing training procedures," and computerized record-keeping and review constituted procedures reasonably adapted to prevent the erroneous issuance of billing statements); *Isaac v. RMB Inc.*, 604 F. App'x 818, 820 (11th Cir. 2015) (finding that specific employee training related to debt collection phone calls was reasonably adapted to prevent noncompliant calls). The corresponding inquiry is fact-laden, to be sure, but one for which summary judgment may be appropriate. *See Arnold*, 659 F. App'x at 572 (affirming summary judgment to debt collector on bona fide error defense); *Isaac*, 604 F. App'x at 820 (same); *Puglisi v. Debt Recovery Sols., LLC*, 822 F. Supp. 2d 218, 229–230 (E.D.N.Y. 2011) (same, collecting cases).

The evidence presented here shows that LTD maintained procedures reasonably adapted to avoid unauthorized electronic payments like the one withdrawn from Mr. Ramirez's checking account. To begin, LTD presented several detailed written policies and procedures explicitly designed and adopted to guard

against violations of federal and state laws, including the FDCPA and EFTA. LTD specifically prohibits electronic payment withdrawals absent express authorization from a bank account holder, which must be established through verbal acknowledgment and confirmation in order to ensure consent and accuracy. Such authorization may be altered or revoked by the authorizing party at any time, and the company's operating procedures include step-by-step guidance on any cancellation. For instance, LTD's procedures include instructions related to identifying and marking the relevant cancelled transactions in its computer system, and sending notice to other internal company departments for auditing. Moreover, LTD representatives are instructed to comply with all client-specific payment restrictions, and to record all actions in standardized computer scripts. It is undisputed that LTD trains its employees on all of these policies and procedures, with violators subject to disciplinary action up to and including termination and even potential personal liability. *Cf. Arnold*, 659 F. App'x at 571 (bona fide error defense established where defendant introduced evidence of "written policies and ongoing training procedures instructing employees about FDCPA prohibitions"); *Isaac*, 604 F. App'x at 820 (bona fide error defense established where defendant had "specifically trained" employees on procedures designed to avoid FDCPA violations).

The apparent weakness in LTD's procedures is that when, as here, a consumer has multiple grouped accounts, the revocation of payment authorization requires

separate action with respect to each account. There is, evidently, no "cancel all" option. Even if such an option did exist, however, it would not necessarily have prevented the error at issue. Here's why. The error here occurred because an LTD representative failed to take certain *additional* actions to cancel payment on the 0132 Account. But a "cancel all" option might do no better because it, likewise, would have required the representative to take certain *other additional* actions to cancel payment on the 0132 Account.[7] Ultimately, the clerical error here lies in human agency, which, even when regulated by routine procedures, is bound to blunder on occasion. Nevertheless, LTD introduced uncontroverted evidence that it specifically instructs and trains its employees on the procedure for completing actions on grouped accounts, like those present here. Notably, Plaintiffs have not suggested an alternative procedure that would have prevented the unauthorized withdrawal at issue or otherwise shown that, under LTD's existing policies and procedures, the risk of its occurrence was unreasonable. *Cf. Arnold*, 659 F. App'x at 571 ("[W]hether or not the alternative [procedure] suggested by [the plaintiff] would have cured the

---

[7] Another alternative procedure might be to cancel payments on all grouped accounts *by default*. This would certainly reduce the requisite number of steps—and, thereby, the concomitant risk of error—when all such accounts are simultaneously cancelled. But, inversely, it would *increase* the number of steps required when—as might happen—a consumer elects to cancel payment on only a subset of all such accounts. With that in mind, and because LTD has introduced evidence of extensive, detailed, and routine procedures implemented to direct this clerical process, the undersigned concludes that its implementation of an individualized cancellation process over a grouped cancellation process is reasonably adapted to prevent the unauthorized withdrawal of funds in any event.

alleged violation, the existence of such an alternative does not challenge the substantial evidence put forward by [the defendant] that it maintains procedures reasonably adapted to avoid error.").

In any event, a policy or procedure need not be "foolproof." *Rhinehart*, 714 F. Supp. 2d at 1185. Instead, the policy or procedure must constitute a "reasonable precaution," and that is the case here. *Bacelli*, 729 F. Supp. 2d at 1333. The undisputed fact remains (as shown by the evidence) that LTD maintains policies and procedures expressly addressing electronic payment withdrawals; that those policies and procedures provide step-by-step guidance on obtaining and cancelling payment authorization, including on grouped accounts; that such policies and procedures instruct representatives to abide by consumer-specific requests and prohibit the withdrawal of unauthorized payments; that LTD trained its employees on how to correctly apply such policies and procedures; and that the company leveraged compliance through the threat of disciplinary action and personal liability. *See Arnold*, 659 F. App'x at 571; *Isaac*, 604 F. App'x at 820.

Accordingly, the undersigned concludes that there is no genuine question of fact that LTD's electronic withdrawal of a single payment after Mr. Ramirez revoked his authorization was a bona fide error. Therefore, summary judgment is appropriate as to Plaintiffs' corresponding claims.

22

### B. LTD's Phone Call to Ms. Ramirez after She Retained Legal Representation

Plaintiffs next contend that LTD violated the FDCPA—and by extension, the FBPA and UDPTEA—when it contacted Ms. Ramirez by phone after she engaged legal counsel with respect to the debt at issue.[8] (Doc. 1 ¶¶ 34, 42, 48; Doc. 56 at 5–9). While conceding that such contact occurred, LTD insists that, at the time, it did not have actual knowledge that Ms. Ramirez was represented, and for that reason it cannot be liable under the FDCPA. (Doc. 51-1 at 9–12; Doc. 61 at 1–7). Moreover, because Plaintiffs' claims asserted under the FBPA and UDPTEA are entirely derivative of their FDCPA claim, LTD continues, the former likewise fall short with the latter.[9] (Doc. 51-1 at 12 n.7). In the alternative, LTD again invokes the bona fide error defense. (*Id.* at 21–24).

The FDCPA prohibits a debt collector from communicating with a consumer

---

[8] Plaintiffs argue for the first time in their summary judgment response that LTD committed a separate violation when the representative with whom Ms. Ramirez spoke on December 11, 2018 *continued* the phone call after learning that Ms. Ramirez was represented by counsel. *See* (Doc. 1 ¶¶ 26, 34, 42, 48; Doc. 56 at 8–9). A party may not raise a new claim in response to a motion for summary judgment. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). In any event, the evidence here shows that, after Ms. Ramirez stated that she was represented by counsel, the LTD representative asked for the attorney's contact information and confirmed that counsel was retained with respect to the debt at issue. The LTD representative did not further discuss collection of the debt itself, and the call ended approximately one minute later. *See* (Doc. 56-2). Accordingly, even if Plaintiffs had properly asserted such a separate violation, the undersigned concludes that the claim is without support in the record.

[9] Notably, Plaintiffs do not make any argument in opposition to summary judgment with respect to their FBPA and UDPTEA claims. *See* (Doc. 56). However, rather than concluding that Plaintiffs have abandoned the claims, the undersigned instead construes such omission as acknowledgement and confirmation of the derivative nature of these claims, as explained below.

it knows to be represented by counsel without the consumer's consent. Specifically,

Section 1692c(a)(2) of the FDCPA provides, in pertinent part:

> [A] debt collector may not communicate with a consumer in connection with the collection of any debt . . . *if the debt collector knows the consumer is represented by an attorney with respect to such debt* and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer . . . .

15 U.S.C. § 1692c(a)(2) (emphasis added).

Although there does not appear to be any binding decision on point, courts in this Circuit and elsewhere have generally interpreted the knowledge requirement embedded in Section 1692c(a)(2) and emphasized in the above excerpt to require that a debt collector have "actual knowledge" of attorney representation with respect to the specific account at issue. *See, e.g., Castellanos v. Portfolio Recovery Assocs., LLC*, 297 F. Supp. 3d 1301, 1309 (S.D. Fla. 2017) ("With respect to . . . Section 1692c(a)(2) . . . courts have uniformly interpreted the knowledge requirement to require that a debt collector have 'actual knowledge' of attorney representation . . . ."); *Watson v. Capital One Servs., LLC*, No. 3:10-cv-358-J-37JRK, 2011 WL 2560230, at *4 (M.D. Fla. June 7, 2011) ("In deciding what type of knowledge is required under [Section 1692c(a)(2)], the great majority of federal courts have required actual knowledge on the part of the debt collector . . . ."); *Gebhardt v. LJ Ross Assocs., Inc.*, No. 15-2154, 2017 WL 2562106, at * 2 (D. N.J. June 12, 2017)

24

("[Section 1692c(a)(2)], as a matter of law, requires the debt collector to have actual knowledge of an individual's legal representation prior to making a communication."); *Schmitt v. FMA Alliance*, 398 F.3d 995, 997–98 (8th Cir. 2005) (refusing to impute knowledge to a debt collector under the FDCPA); *Randolph v. IMBS, Inc.*, 368 F.3d 726, 729–30 (7th Cir. 2004) (same). And, plainly put, "to have 'actual knowledge' of a piece of information, one must *in fact* be aware of it." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S.Ct. 768, 776 (2020) (collecting legal definitions) (emphasis added); *see also* BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining "*actual knowledge*" as "[r]eal knowledge as distinguished from presumed knowledge or knowledge imputed to one because of his having had information which should have put him on inquiry that would have led to real knowledge."). Plaintiffs argue against this requirement, but cite no relevant caselaw in support.[10]

As already noted above, a violation of the FDCPA constitutes a violation of Georgia's FBPA. *See 1st Nationwide Collection Agency*, 654 S.E.2d at 431; *Harris*, 702 F.3d at 1303. The other state statute implicated by Plaintiffs' claim—*i.e.*,

---

[10] The lone case cited by Plaintiffs in urging a relaxed knowledge requirement is an unpublished Report and Recommendation from this Court, *Ghanem v. Zwicker & Assocs., P.C.*, 1:12-cv-03513-RWS-GGB, 2013 WL 12382884, at *4 (N.D. Ga. Mar. 26, 2013) (Brill, J.), but it does not help their cause. The question of whether Section 1692c(a)(2) requires *actual knowledge* was not presented to the Court in *Ghanem* because the defendant in that case expressly admitted that it violated the statute, thereby mooting the point.

Georgia's UDPTEA—provides, in turn, for a cause of action and enhanced civil penalties for any party engaging in deceptive trade practices in violation of the FBPA against "elder or disabled persons." O.C.G.A. §§ 10–1–851, 10–1–853; *see also Sheppard v. Bank of Am., NA*, 542 F. App'x 789, 793 (11th Cir. 2013). Put briefly, then, a federal FDCPA claim may serve as a predicate offense under the FBPA, which itself may serve as a predicate under the UDPTEA.

In this case, the evidence does not reasonably support an inference that LTD had actual knowledge of Plaintiffs' legal representation when it called Ms. Ramirez on December 11, 2018. Plaintiffs contend that they and their legal counsel provided sufficient bits of information from which LTD should have known better "through inference, analysis, or observation." (Doc. 56 at 8). But the governing standard requires more, and the evidence does not show that it was met in this case. Although Plaintiffs' attorney, Mr. Carlson, sent LTD a letter of representation six days before the phone call at issue, the letter did not clearly communicate the relevant facts. *Cf. Tong v. Capital Mgmt. Servs. Grp., Inc.*, 520 F. Supp. 2d 1145, 1148 (N.D. Cal. 2007) (debt collector's knowledge established where representation letter included the consumer's address and account number); *Serrano v. Van Ru Credit Corp.*, 126 F. Supp. 3d 1005, 1009 (N.D. Ill. 2015) (debt collector's knowledge established where representation letter included the consumer's name and an accompanying affidavit). Critically, the letter failed to include Ms. Ramirez's maiden name

("Stofer"), under which the Loan Accounts were listed in LTD's system and by which Ms. Ramirez self-identified in phone calls with LTD. Plaintiffs point out that Mr. Carlson's letter also referenced Mr. Ramirez by name, who had authorized payment on the Loan Accounts and had been acknowledged by LTD as Ms. Ramirez's husband. However, evidence shows that the Loan Accounts were not listed under Mr. Ramirez's name, and LTD is only able to name-search its records using the name of the consumer —in this case, "Tailer Stofer."[11] Finally, while Mr. Carlson's letter did include the last four digits of Ms. Ramirez's social-security number, the undisputed evidence again shows that LTD is unable to search its records based on this information alone.

Even if, as Plaintiffs contend, they and their attorney provided sufficient details to LTD before the December 11, 2018 phone call from which an inference of legal representation *could possibly* have been drawn, actual knowledge requires more—namely, that such an inference was, *in fact*, drawn. *See Castellanos*, 297 F. Supp. 3d at 1309; *Sulyma*, 140 S.Ct. at 776. The evidence here, however, shows otherwise. To recap, Mr. Carlson provided information concerning legal representation on two occasions—first, via his December 5, 2018 letter; second, in his response to LTD's initial follow-up request for additional identifying material.

---

[11] LTD has presented undisputed evidence showing that name-searches of its records for "Tailer Ramirez," "Manuel Ramirez," and "Manny Ramirez" return dozens of results but do not include the Loan Accounts at issue. (Doc. 61-1, ¶¶ 13–15, 20–23).

In each case, LTD promptly notified Mr. Carlson that it could not locate the accounts at issue based on the details provided, and it clearly articulated the type of information needed—namely, account number(s), address, full social-security number, or phone number. The only information that Mr. Carlson supplied in response was Plaintiffs' address in Columbus, Georgia. The trouble is that Plaintiffs had not previously provided this information to LTD, so its records only reflected Ms. Ramirez's previous address in Junction City, Kansas.[12] In sum, the evidence here shows that LTD did not *in fact* know that Plaintiffs were legally represented at the time of the December 11, 2018 phone call. Plaintiffs have introduced no evidence to controvert this showing.

In the alternative, LTD also argues that it is entitled to the bona fide error defense with respect to Plaintiffs' post-representation claims. *See* (Doc. 51-1 at 21–24). The undersigned agrees. As with Plaintiffs' claims regarding the unauthorized withdrawal of funds from Mr. Ramirez's checking account, even if there was a violation in the first instance here, there is no indication in the record that the December 11, 2018 phone call to Ms. Ramirez was anything other than an

---

[12] Ms. Ramirez's equivocal testimony that she believes she "would have" told LTD about her address in Columbus, Georgia is, absent any other factual details or supporting evidence, insufficient to raise a genuine question of fact on the issue. *See Wen Liu v. University of Miami Sch. of Med.*, 693 F. App'x 793, 795 (11th Cir. 2017) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Thus, statements in an affidavit based, in part, upon information and belief—instead of only knowledge—cannot raise a genuine issue of fact.") (quotations omitted).

unintentional mistake. The evidence shows instead that, after Mr. Carlson submitted his representation letter, LTD twice responded in an effort to obtain additional identifying information before the December 11, 2018 call was made. And the call transcript itself shows that the LTD representative who contacted Ms. Ramirez was unaware at the time that she was represented by counsel; that the representative requested her counsel's contact information and confirmed the nature of the representation; that the representative promptly ended the call without further collection efforts; and that no further calls were made to Plaintiffs. Moreover, LTD presented evidence of detailed company policies and procedures regarding the steps to be taken in the event a consumer retains an attorney, including a prohibition on direct consumer contact after representation. Therefore, even if knowledge of Plaintiffs' legal representation could be imputed to LTD before the December 11, 2018 call, the undisputed evidence shows that it is entitled to the bona fide error defense. *See Arnold*, 659 F. App'x at 571; *Isaac*, 604 F. App'x at 820. For this further reason, LTD is entitled to summary judgment on the corresponding claims.

Accordingly, the undersigned concludes that there is no genuine question of fact regarding LTD's actual knowledge of Plaintiffs' legal representation prior to the December 11, 2018 phone call to Ms. Ramirez; but in any case, LTD is entitled to the bona fide error defense even if it possessed the requisite knowledge. Therefore, summary judgment is appropriate on all related claims.

## IV. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant LTD Financial Services, L.P.'s Motion for Summary Judgment (Doc. 51) be **GRANTED**. The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

IT IS SO **RECOMMENDED** on this 16th day of July 2021.

_____
REGINA D. CANNON
United States Magistrate Judge